UNITED STATES of America,
Plaintiff–Appellee,

v.

William CASH and Michael Croyle,
Defendants–Appellants.

Nos. 97–3748, 97–3749.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1998.

Decided July 23, 1998.

Haywood E. McDuffie (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Sara L. Ellis (argued), Office of the Federal Defender Program, Steven Shobat, Chicago, IL, for William Cash.

Terence MacCarthy, Sara L. Ellis (argued), Office of the Federal Defender Program, Chicago, IL, for Michael Croyle.

Before ESCHBACH, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

William Cash and Michael Croyle sold 30 auto sears to undercover agents and agreed to sell another 37, plus a silencer and two AR–15 semi-automatic rifles (with kits to make them fully automatic). Auto sears enable semi-automatic weapons to be used as fully automatic weapons, which means that auto sears themselves are defined as "machineguns" by 26 U.S.C. § 5845(b). The devices defendants sold lacked serial numbers and were unregistered. As part of a plea bargain, Cash and Croyle pleaded guilty to conspiring to possess and transfer the silencer, in violation of 26 U.S.C. § 5861, and therefore, derivatively, in violation of 18 U.S.C. § 371 (the general conspiracy statute). Cash was sentenced to 33 months' imprisonment and Croyle to 37 months, terms calculated on the assumption that the sale of auto sears was relevant (unlawful) conduct under the Sentencing Guidelines.

See U.S.S.G. § 2K2.1(b). Both defendants contend that the auto sears should not have been treated as firearms and therefore should not have increased their sentences.

■ Because auto sears are treated as machine guns, 26 U.S.C. § 5845(b), machine guns are "firearms" for purposes of the Guidelines, U.S.S.G. § 2K2.1 Application Note 3(ii), and none of the transfers was registered to the purchaser, defendants' argument hangs by a thread. The thread is ATF Ruling 81–4, which we reproduce in full:

> The Bureau of Alcohol, Tobacco and Firearms has examined an auto sear known by various trade names including "AR15 Auto Sear," "Drop In Auto Sear," and "Auto Sear II," which consists of a sear mounting body, sear, return spring, and pivot pin. The Bureau finds that the single addition of this auto sear to certain AR15 type semiautomatic rifles, manufactured with M16 internal components already installed, will convert such rifles into machineguns.

> The National Firearms Act, 26 U.S.C. 5845(b) defines "machinegun" to include any combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

> **Held:** The auto sear known by various names including "AR15 Auto Sear," "Drop In Auto Sear," and "Auto Sear II," is a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. Consequently, the auto sear is a machinegun as defined by 26 U.S.C. 5845(b).

> With respect to the machinegun classification of the auto sear under the National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be applied to auto sears manufactured before November 1, 1981. Accordingly, auto sears manufactured on or after November 1, 1981, will be subject to all the provisions of the National Firearms Act and 27 C.F.R. Part 179.

Cash and Croyle rely on the first sentence of the ruling's fourth paragraph. They insist that the prosecution did not negate the possibility that the 67 auto sears were manufactured before November 1, 1981, and therefore did not prove that they are "machineguns" under § 5845(b). It is not at all clear that defendants (or, for that matter, the prosecutor) correctly understand the effect of this proviso. Defendants believe that it places auto sears manufactured before November 1, 1981, outside all obligations laid by statute on the ownership and transfer of firearms. But nothing in the firearms statutes gives the Secretary of the Treasury (or the Bureau of Alcohol, Tobacco and Firearms) the power to make exemptions to § 5845(b) and associated legal obligations. The statute to which ATF Ruling 81–4 refers, 26 U.S.C. § 7805(b), provides that the Secretary cannot give retroactive application to tax regulations and adds in § 7805(b)(8) that the "Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect." Read in conjunction with § 7805(b)(8), the proviso in the fourth paragraph of ATF Ruling 81–4 means only that the Secretary will not collect any tax under 26 U.S.C. §§ 5801, 5811, or 5821 on account of auto sears manufactured or transferred before November 1, 1981. The ruling does not—and cannot—excuse compliance with criminal laws applicable at the time of post–1981 transfers. Cash and Croyle transferred the auto sears in 1994 and 1995, when § 5845(b) and ATF Ruling 81–4 alike defined auto sears as machine guns; they therefore had to comply with the laws regulating transfers, such as 26 U.S.C. § 5841(b) ("Each firearm transferred shall be registered to the transferee by the transferor"). See also 26 U.S.C. § 5861(e) (making a violation of § 5841(b) criminal).

Nonetheless, the prosecutor appears to be content with defendants' reading of ATF Ruling 81–4 and argues only that the evidence does not show that these auto sears predate 1982. Perhaps the prosecutor was misled by language in *United States v. Bradley*, 892 F.2d 634, 636 (7th Cir.1990), which

stated that under ATF Ruling 81–4 "auto sears made after a certain date must be registered even if transferred in isolation." This may be thought to imply that auto sears made earlier may be transferred today without registration. Like Cash and Croyle, Bradley contended that auto sears manufactured before November 1981 need not be registered even if transferred after the Ruling's date; we did not evaluate that possibility in *Bradley* in light of other facts but added that Bradley's "argument misunderstands ATF 81–4." 892 F.2d at 636. As in *Bradley* we move on without final resolution—for the prosecutor's acquiescence in defendants' legal position has deprived them of any reason to offer arguments supporting it. Perhaps their reading has some basis that we do not now perceive. Firearms dealers would do well to assume, however, that all current transfers of auto sears must comply with the statutes, no matter when the devices were manufactured.

■ Conversations between Croyle and an agent (posing as a private buyer) were tape recorded. When the agent offered to buy five auto sears, Croyle replied: "Five? I gotta get 'em made in orders of fifteen.... [My supplier Freddie] won't even turn the ... machine on for five." Croyle told the agent that Freddie fabricated the bodies of the auto sears, which Croyle himself had to finish:

> I get 'em all nice and smooth, ... 'cause he just, he just roughs 'em out. Gets 'em going for me and I, I finish um all by hand and I got to go buy the springs ... 'cause I get uh a precision spring.... I got to cut 'em down and I make 'em fit, each one, and that, and those I gotta harden 'em, put 'em together and stuff.

Croyle added that he "tumbled" the parts in order to remove burrs and polish the surfaces. At the sentencing, however, defendants maintained (through counsel; they did not testify) that this was just sales talk—that the auto sears actually had been purchased by mail order from magazines, where advertisements tout the availability of "pre-'82 drop-in auto sears". After obtaining these "legitimate" auto sears, the defendants insisted, Croyle replaced their springs with newer ones—a step that they contend does not compromise the pre-1982 "manufacture" date of the auto sears.

The district judge chose to believe Croyle the entrepreneur over Croyle the defendant—and sensibly so. Magazine advertisements offer each "pre-'82 drop-in auto sear" for approximately $150. Cash and Croyle sold auto sears to the agent for less than $65 apiece. It is hard to stay in business buying at $150, repairing the inventory at extra expense, and selling at $65. Defendants' selling price, plus their use of code words and other hugger-mugger that accompanies black market transactions, supports the district judge's inference that the auto sears were of recent manufacture, and that defendants knew full well that their activities violated the law.

Like the district judge, we think it unnecessary to decide when the repair of a pre–1982 auto sear counts as the "manufacture" of a new auto sear. Defendants were not charged with illegally making the auto sears, see 26 U.S.C. § 5845(i) (defining the term "make"); cf. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992), or with evading the tax on manufacturing; the relevant conduct that led to the sentence enhancement was the *transfer* of machine guns without registration. On defendants' reading of ATF Ruling 81–4, the only way to escape the conclusion that the transfers in 1994 and 1995 were illegal is to find that the auto sears were "manufactured" before November 1, 1981. Not even defendants' expert witness was willing to testify that the devices transferred to the agent were made that long ago; the most he would say was that the possibility could not be ruled out. A defendant who wants to take advantage of an exception to a statute must do better than that. The selling price and Croyle's statements show that these auto sears were made by "Freddie" and Croyle no earlier than 1994.

AFFIRMED.